[No. 26584. *En Banc.* February 4, 1937.]

THE STATE OF WASHINGTON, *on the Relation of Herman Nelson, Plaintiff,* v. THE SUPERIOR COURT FOR KING COUNTY *et al., Respondents,* PUGET SOUND POWER & LIGHT COMPANY, *Intervener.*[1]

*Houghton & Cluck,* for relator.

*B. Gray Warner* and *Edwin C. Ewing,* for respondent.

*Clarence Innis* and *Todd, Holman & Sprague,* for intervener.

*W. E. Heidinger, Dean H. Eastman,* and *Elias A. Wright, amici curiae.*

MAIN, J.—Herman Nelson, a qualified elector and taxpayer in King county, by this action sought a writ of mandate to require the election board of the county

[1]Reported in 64 P. (2d) 1019.

to hold an election on the second Tuesday of March, 1937, being the 9th day of that month, for the purpose of submitting to the electors, in that portion of King county outside of the city of Seattle, the question of the creation of a public utility district. After the action was instituted, the Puget Sound Power and Light Company intervened. To the affidavit supporting the application for the writ, there was directed a motion to quash, and also a demurrer. The motion was granted, the demurrer sustained, and a judgment entered dismissing the action. To review this judgment, the case is here by writ of certiorari.

The facts stated in the affidavit need only be briefly summarized. Prior to December 3, 1936, more than ten per cent of the qualified electors of King county residing outside the corporate limits of the city of Seattle, signed, and caused to be filed with the county auditor, a petition for the formation of a public utility district. Within fifteen days after the filing of the petition, the auditor examined the signatures and certified to the sufficiency thereof. The petition was thereupon, by the auditor, transferred to the board of county commissioners. Thereafter, the commissioners held a hearing at which certain persons appeared to protest against the inclusion of their lands in the district, and others in support of the formation of the district. The commissioners made and entered an order establishing and defining the boundaries of the proposed utility district and transmitted the proposition for the formation thereof to the election board of King county.

The question then arose as to whether the proposition could be submitted on March 9th, or whether it could only be submitted at a biennial general election at which state and county officers are elected. The majority of the board were of the view that the propo-

sition could not be submitted on March 9th, but could only be submitted at a general election at which state and county officers are elected. Thereafter, the present action was instituted for the purpose above stated.

The question presented is whether, under chapter 1 of the Laws of 1931, p. 3 (Rem. Rev. Stat., § 11605 [P. C. § 4498-11] *et seq.*), which is an act relating to, and authorizing, the establishment of public utility districts, a general election, as mentioned in that act for the formation of a district, means an election at which state and county officers are elected, or an election at which public utility district commissioners are elected. To determine this question, requires a consideration of the statute.

Section 1 of the act (Rem. Rev. Stat., § 11605 [P. C. § 4498-11]) provides that its purpose is to authorize the establishment of public utility districts to conserve the water and power resources of the state.

Section 2 (Rem. Rev. Stat., § 11606 [P. C. § 4498-12]) makes such districts municipal corporations, to be known as public utility districts.

Section 3 (Rem. Rev. Stat., § 11607 [P. C. § 4498-13]) provides that, at any "general election," the board of county commissioners of any county, on petition of ten per cent of the qualified electors of such county, based on the total vote cast at the last general county election, shall submit to the voters the proposition of creating a public utility district which shall be coextensive with the limits of the boundaries of the county.

There is another provision in this section to the effect that any petition for the formation of a public utility district may describe a less area than the entire county in which the petition is filed. It is under this latter provision that the district here in question

is sought to be organized, because it does not include the entire county.

This section further provides that the petition shall be filed with the county auditor, who shall within fifteen days examine the signatures thereof and certify to the sufficiency or insufficiency of the petition. Whenever such petition shall be certified to as sufficient, the county auditor shall forthwith transmit the same, together with his certificate of sufficiency attached thereto, to the board of county commissioners, who shall thereupon immediately transmit such proposition to the election board of such county, and it shall be the duty of such county election board to submit such proposition to the voters at the "next general election." It will be noted that, in this connection, the "next general election" refers to the proposition to establish the district.

Section 4 (Rem. Rev. Stat., § 11608 [P. C. § 4498-14]) provides that, within five days after the election shall have been held, the election board is required to canvass the returns, and, if at the election a majority of the voters voting upon the proposition shall vote in favor of the formation of the district, the election board shall so declare, and "such public utility district shall then be and become a municipal corporation of the State of Washington, . . ."

It should be noted that here is an express provision that the district does not come into existence until after the election board shall have canvassed the returns and found that the proposition was sustained by the vote. At the same election at which the proposition of forming the district is submitted to the voters, three commissioners are to be elected, to hold office, respectively, for one, two, and three years.

Section 4 further provides that:

"All expenses of elections for the formation of such public utility districts shall be paid by the county holding such election, and such expenditure is hereby declared to be for a county purpose, and the money paid out for such purpose shall be repaid to such county by the public utility district, if formed."

There is also a provision that, if a vacancy occurs in the office of a public utility district commissioner, such vacancy shall be filled at the next "general election."

Section 5 (Rem. Rev. Stat., § 11609 [P. C. § 4498-15]) of the act provides that:

"The term general election as used in this act shall be held and construed to mean biennial general elections at which state and county officers are elected, and also public utility district elections for the election of commissioners. Public utility district elections for the election of commissioners held in Class A counties [King county being in that class] . . . shall be held on the second Tuesday in March in each year, . . ."

The question immediately here for determination is: What is meant by the term "general election" in the portion of the statute just quoted? It will be observed that it is there said that the term "general election," as used in the act, shall be held to mean "biennial general elections at which state and county officers are elected," and also "public utility district elections for the election of commissioners." If the election sought to be held is a public utility district election for the election of commissioners, then the second clause in the statute would apply. On the other hand, if the election to vote upon the organization of the district is not a public utility district election for the election of commissioners, then it necessarily falls under the first clause of the

statute, which is "general elections at which state and county officers are elected."

As already pointed out, it is provided in the preceding section of the statute that all expenses for the formation of a district "shall be paid by the county holding such election, and such expenditure is hereby declared to be for a county purpose, . . ." It should be noted that, by this language, the county holds the election, pays the expenses thereof, and such expenditure is declared to be "for a county purpose." There is also the provision that such expenses shall be refunded by the district, if formed.

Looking again at the second clause quoted from section 5, which is that of "public utility district elections for the election of commissioners," it is difficult to see how there could be a public utility district election for the election of commissioners prior to the time that the district could possibly be formed under the express language of the act, to which attention has already been called. It is true that, at the time at which the vote is taken upon the proposition of creating the district, there is a provision in the statute for the nomination and election of three commissioners, but this, obviously, was for the purpose of saving the trouble and expense of another election in case the district should be created. Those persons, so named, may never become commissioners. This depends upon whether the district is created. It cannot be said that, because three commissioners are voted upon at the time the vote is taken upon the formation of the district, this is a "public utility district election for the election of commissioners" within the contemplation of the statute.

It would seem reasonably clear that the legislative intent was that the term "general election", as used in the act, should, for the purpose of creating a public

utility district, refer to a "biennial general election at which state and county officers are elected." The term "general election," at which "public utility district elections for the election of commissioners" are held, obviously means elections which take place after the formation of the district.

It does no violence to the statute to hold that the election for the establishment of the district may be considered a county election, and that it is reasonable to hold that "elections held by the public utility district for the election of commissioners" is a district election, and, being a district election, as already pointed out, it could only be held subsequent to the formation of the district.

The judgment will be affirmed.

STEINERT, C. J., BLAKE, and HOLCOMB, JJ., concur.

ROBINSON, BEALS, and TOLMAN, JJ., concur in the result.

GERAGHTY, J. (dissenting)—The single question is: What is the next general election within the intent of the utility district act?

It is evident that the act is written with relation to, and takes for granted, the existing statutes governing elections, and plainly evinces a purpose to harmonize its provisions with those of the general statutes, particularly as to the dates on which elections are to be held.

Looking to the existing statutes, we find, with respect to class A counties, to which King county belongs, two types of general elections provided for. Remington's Revised Statutes, § 5143 [P. C. § 2120-1], provides:

"All state and county elections in class A counties and counties of the first class, whether *general* or *special,* and whether for the election of federal, United

States senatorial or congressional, or state, legislative, county or precinct officers, or for the submission to the voters of any question for the adoption and approval or rejection, shall be held on the first Tuesday after the first Monday of November, in the year in which they may be called: Provided, that this section shall not be construed as fixing the time for holding the elections for the recall of county officers or primary elections, nor special elections to fill vacancies for members of the congress of the United States or members of the state legislature.'' (Italics mine.)

As to municipal and district elections in class A counties, § 5144 [P. C. § 2120-2] provides:

''That all city, town, school district, port district, park district, irrigation district, dike district, drainage district, drainage improvement district, diking improvement district, river improvement district, commercial waterway district, water district and all other municipal and district elections whether *general* or *special* and whether for the election of municipal or district officers or for the submission to the voters of any city, town or district of any question for their adoption and approval, or rejection, shall be held in class A counties and counties of the first class on the second Tuesday in March, 1924, and thereafter in the year in which they may be called: . . .'' (Italics mine.)

The utility district act does not leave the question dependent upon implication, but specifically defines the term ''general election'' as meaning the elections held on the days fixed in the above quoted sections. The definition, found in § 5 (Rem. Rev. Stat., § 11609 [P. C. § 4498-15]) of the act, is as follows:

''The term general election as used in this act shall be held and construed to mean biennial general elections at which state and county officers are elected, and also public utility district elections for the election of commissioners. Public utility district elections for the election of commissioners held in class A counties and counties of the first class shall be held on the sec-

ond Tuesday in March in each year, and in all other counties on the first Saturday in December in each year.''

· Both §§ 5143 and 5144, *supra,* refer to ''general elections'' in the respective governmental subdivisions,— § 5143 to state and county elections; § 5144 to city, district and other local elections. While we are accustomed colloquially to use the term ''general elections'' in the sense of the elections held biennially for national, state and county officers, § 5144 applies the term as well to the stated elections held in cities, districts and other municipal subdivisions, which are defined as general within the territorial limits of the governmental subdivisions of the county.

The definition of a general election found in § 5 of the utility act, makes plain the intent to recognize the existing election day for municipal subdivisions as one at which propositions for the creation of utility districts may be submitted; only a strained construction, it seems to me, can make the section read otherwise.

MILLARD, J. (dissenting)—The majority opinion recites:

''It is difficult to see how there could be a public utility district election for the election of commissioners prior to the time that the district could possibly be formed.''

A sufficient answer to that statement is the language of the statute (§ 4, chapter 1, Laws of 1931, Rem. Rev. Stat., § 11608 [P. C. § 4498-14]) that, at the same election at which the proposition is submitted to the voters as to whether a public utility district shall be formed, three public utility district commissioners *shall* be elected.

The majority opinion further recites that:

"It cannot be said that, because three commissioners are voted upon at the time the vote is taken upon the formation of the district, this is a 'public utility district election for the election of commissioners' within the contemplation of the statute."

It would be none the less an election of public utility district commissioners, because at the same election the proposition is submitted to the voters as to whether a public utility district shall be formed. Also, a sufficient answer to the statement of the majority is the language of the statute (§ 5, chapter 1, Laws of 1931, Rem. Rev. Stat., § 11609 [P. C. § 4498-15].) defining the term "general election," as used in the act. The legislature has defined the term "general election" to include, not only biennial general elections, but "also public utility district elections for the election of commissioners." It is as much an election of public utility district commissioners at the time of the formation of the district as is an election of their successors subsequent to the formation of the district.

I also concur in the views expressed by GERAGHTY, J. The judgment should be reversed.